UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-2359

PUERTO RICO SUN OIL COMPANY,

Petitioner,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER OF

THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

Before

Selya, Cyr and Boudin,

Circuit Judges.

Robert Brager with whom Richard S. Davis, Joseph C. Stanko, Jr.,

Patricia Ross McCubbin, Beveridge & Diamond, P.C., Leonardo Andrade-

Lugo, Jose A. Cepeda-Rodriguez, Carlos A. Rodriguez-Vidal, Eli Matos-

Alicea, Goldman Antonetti Cordova & Axtmayer and Edward J. Ciechon Jr.

were on brief for petitioner.
Alan D. Greenberg, Environment & Natural Resources Division,

Environmental Defense Section, Department of Justice, with whom Myles

E. Flint, Acting Assistant Attorney General, Randolph L. Hill and

Meyer Scolnick, Assistant Regional Counsel, Environmental Protection

Agency, were on brief for respondent.

October 21, 1993

BOUDIN, Circuit Judge. In August 1990, the

Environmental Protection Agency issued a pollution discharge

permit to Puerto Rico Sun Oil Company ("the Company"). In

doing so EPA complied with the substantive requirements of

the governing statute and the procedures set forth in the

statute and EPA regulations. Only the result gives cause for

concern, and that concern is not allayed by the agency's

explanation for its decision. In our judgment, the result is

so odd that either the EPA has abused its discretion or it

has explained itself so poorly as to require further

justification. On either view, we must vacate the agency's

order adopting the permit and remand for further proceedings.

I. THE FACTS

The Clean Water Act, 33 U.S.C. 1251, et seq.,

prohibits the discharge into protected waters of any

pollutant by any person, id. 1311(a), unless a discharge

permit has been secured from EPA. Id. 1342. The

permitting regime is a hybrid one in which both EPA and the

counterpart state agency play a role. The precise role

depends on whether EPA has delegated permit issuing authority

to the state; but no such delegation is present here. Puerto

Rico is treated as a state for purposes of the Clean Water

Act, id. 1362(3), and its local agency is the Environmental

Quality Board ("EQB").

-2-

To obtain a permit, the applicant must satisfy a variety

of substantive requirements under the Clean Water Act but, in

addition, no EPA permit can issue unless the state in which

the discharge will occur gives its own approval (called

"certification") or waives its right to do so. 33 U.S.C.

1341(a)(1). Further, the state certification may impose

discharge limitations or requirements more stringent than

federal law requires, and those more stringent obligations

are incorporated into the federal permit as a matter of

course. See generally United States v. Marathon Development

Corp., 867 F.2d 96, 99 (1st Cir. 1989) (describing state

role). What lies at the heart of this case is EQB's effort

to impose, and then back away from, such more stringent

obligations.

For some years before this case began, the Company held

a discharge permit for its oil refining facility at Yabucoa

Bay, Puerto Rico, where it discharges pollutants from two

different sources. On May 27, 1988, the Company submitted to

EPA an application to renew the permit for its facility. On

October 31, 1988, EPA forwarded the application to EQB,

requesting that a draft certification be prepared promptly.

EPA also warned EQB that under EPA regulations, Puerto Rico's

right to impose obligations by certification would be waived

if a final certification were not received within 60 days

-3-

after EPA sent a copy of a (yet to be prepared) draft permit

to EQB. 40 C.F.R. 124.53(c)(3) (60 day time limit).1

On January 25, 1989, EQB released a tentative

certification--essentially a draft document that facilitates

public comment on the proposed state certification and

proposed federal permit. The draft certification in this

case probably came as a surprise to the Company. The earlier

permit had employed a "mixing zone" analysis in setting the

pollution limitations for the Company's discharged effluent;

the draft certificate did not include a mixing zone analysis.

The difference, which is central to this case, needs a word

of explanation.

A discharge permit under the Clean Water Act may include

several types of requirements. One set concerns the

technology used to limit pollution; another, pertinent here,

requires that the amount of specified pollutants not exceed

certain percentage levels. In theory, the percentage levels

could be measured in the effluent itself--such as storm

runoff or waste water--just as it drains into the stream,

river or bay which is protected by the Clean Water Act;

alternatively, it could be measured at the edge of a defined

1The Clean Water Act provides that the state waives its
certification rights if it fails to issue or to deny a
certification "within a reasonable period of time (which
shall not exceed one year) after receipt of such request . .
. ." 33 U.S.C. 1341(a(1).

-4-

area of the receiving body of water after the pollutant has

been diluted by that water.

Such a defined area is called a mixing zone, and it

appears that measuring pollutants at the edge of the mixing

zone is widespread in the application of the Clean Water Act.

According to an EPA publication, "[w]hether to establish such

a mixing zone policy is a matter of State discretion." EPA,

Mixing Zones--Water Quality Standards Criteria Summaries: A

Compilation of State/Federal Criteria 2 (September 1988)

("Mixing Zones"). Practically every state and Puerto Rico

have adopted mixing zone criteria, id., although the criteria

appear to differ widely. Id. at 70-78 (Puerto Rico criteria

as of 1988). The mixing zone concept is described in

Marathon Oil Co. v. EPA, 830 F.2d 1346, 1349 (5th Cir. 1987),

which concludes with the observation that "the `mixing zone'

determination is basically a cost-benefit judgment on a given

set of environmental facts, rather than any sort of

`scientific' determination." Id. at 1351.

When in January 1989 EQB issued its draft certification

for the Company's requested permit, the EQB was reformulating

its mixing zone criteria. EQB's draft certification for the

Company neither continued in force the old mixing zone

criteria temporarily nor made the certificate subject to the

new criteria still under development. Instead, the draft

certification simply set further pollutant limitations which,

-5-

absent the mixing zone analysis, apply directly to the

effluent as it enters the receiving waters. Mixing Zones,

supra, at 2 ("If no such mixing zone is recognized by a

State, then the waters must meet the criteria at the point of

discharge.").

The next event was EPA's release on August 11, 1989, of

a draft permit and request for public comment. The draft

permit incorporated the requirements of the draft

certification issued by EQB and therefore used no mixing zone

analysis. Although issuance of the draft permit meant that

final EQB certification was now due in 60 days, 40 C.F.R.

124.53(c)(2), EQB apparently paid no attention to the

deadline or to EPA's earlier warning that failure to meet the

deadline would waive Puerto Rico's right to certify.

Nevertheless, in October 1989 EPA told the Company's

attorneys that it was extending the comment period on the

draft permit "indefinitely" while awaiting the EQB's final

certification. When the certification arrived, said EPA, it

would set a "prompt" close to the comment period.

On July 24, 1990, almost a year after receiving the

draft permit, EQB issued what it called its "final" water

quality certification for the Company, again eschewing a

mixing zone analysis. Both the timing and substance of this

action are puzzling because, only four days before, on July

20, 1990, EQB had promulgated new regulations to be effective

-6-

on August 20, 1990, adopting a new method of determining

mixing zones. But if EQB's behavior was slothful and

careless, EPA's reaction was even stranger.

At this point the EQB's final certification must have

appeared a probable candidate for administrative or judicial

revision in Puerto Rico. EQB had used a mixing zone analysis

in the past and was proposing to do so in the future, and the

use of such an analysis was likely to be significant; indeed,

the Company later represented, and EPA has not disputed the

claim, that its refinery cannot operate if forced to meet the

pollution standards without the help of a mixing zone

analysis. Yet just as the Company moved to correct the EQB

certification, EPA moved even more swiftly to adopt a final

permit based on the EQB certificate that omitted a mixing

zone analysis.

The chronology can be compressed. On August 17, 1990,

the Company asked EQB to reconsider its certification and

include a mixing zone analysis. On August 21, 1990, EPA

published a new draft permit incorporating EQB's final

certification requirements, and it offered 30 days to submit

comments. On September 7, 1990, EQB wrote to EPA saying that

it was evaluating the Company's comments on reconsideration

and that it might alter its certification. On September 10

and on September 21, 1990, the Company asked EPA to delay

action on the permit to allow the EQB to complete its

-7-

reconsideration. On September 28, 1990, EPA issued a final

permit, based on the then July 1990 EQB certification and

without provision for a mixing zone.

On November 7, 1990, the Company sought administrative

review within EPA, an action that automatically stayed the

new permit, 40 C.F.R. 124.15(b)(2), and left the old one in

force on a temporary basis. On November 28, 1990, EQB

adopted a resolution staying its certification pending

reconsideration and announcing, for the benefit of EPA, that

the certificate was "not to become final" until the

reconsideration was completed. In February 1991, EQB wrote

formally to EPA stating that the certificate should be

treated as not final and urging EPA to leave the Company's

previous permit in effect for the time being. In June 1992

EPA's regional administrator issued a decision reaffirming

the new permit without a mixing zone provision but continuing

the stay of the new permit pending a further administrative

appeal.

In July 1992, the Company duly appealed the regional

administrator's decision to EPA's Environmental Appeals

Board, urging a number of the arguments discussed below, and

making one further contention of note: the Company said that

unless EPA modified the permit on direct review, the Company

would likely be unable get the mixing zone analysis

incorporated into the permit through subsequent proceedings.

-8-

The reason, said the Company, was "the probable application

of the anti-backsliding policy" of the Clean Water Act, 33

U.S.C. 1342(o). On October 26, 1992, the EPA Environmental

Appeals Board issued a lengthy decision refusing further

review. The Company's appeal to this court followed. 33

U.S.C. 1369(b)(1)(F).

-9-

II. DISCUSSION

Faced with what may be a disastrous outcome from its

standpoint, the Company has offered this court a variety of

procedural challenges to EPA. They range from a broad claim

that EQB's final certification was ineffective (because

Puerto Rico's time to certify had expired) to a trivial

complaint that the EPA did not allow a 15-day extension to

the comment period at one phase of the proceeding. We think

virtually all of the procedural claims fail and, while

addressing them at the close of the opinion, we prefer to

begin by discussing EPA's central error.

EPA's action in adopting the permit in this case is not

flawed by procedural mistake. On the contrary, EPA did a

commendable job of dotting i's and crossing t's. Nor is

there any violation of substantive provisions of the Clean

Water Act; for example, nothing in that statute explicitly

requires EPA to use mixing zone analyses in its permits. The

problem with EPA's decision is simply that the outcome

appears on its face to make no sense. We say "appears"

because we cannot rule out the possibility that some further

explanation could shore up the EPA's result. Either way, the

EPA's present action cannot stand.

It may come as a surprise that agency decisions must

make sense to reviewing courts. Agencies, after all, are

normally entitled to substantial deference so long as their

-10-

decisions do not collide directly with substantive statutory

commands and so long as procedural corners are squarely

turned. This deference is especially marked in technical

areas. But in the end an agency decision must also be

rational--technically speaking, it must not be "arbitrary or

capricious," Administrative Procedure Act, 5 U.S.C.

706(2)(A)--and that requirement exists even in technical

areas of regulation. E.g., Public Citizens Health Research

Group, v. Tyson, 796 F.2d 1479, 1505 (D.C. Cir. 1986). The

requirement is not very hard to meet, but it has not been met

here.

The "arbitrary and capricious" concept, needless to say,

is not easy to encapsulate in a single list of rubrics

because it embraces a myriad of possible faults and depends

heavily upon the circumstances of the case. Still, there are

rules of thumb, e.g., Motor Vehicle Mfrs. Ass'n v. State Farm

Mutual Ins. Co., 463 U.S. 29, 43 (1983) (listing examples).

In addressing individual aspects of EPA's decision, we cite

to those requirements--discussion of relevant issues,

consistency with past practice, avoidance of unexplained

discrimination--that are pertinent to EPA's decision in this

case.

On the surface of the administrative record, the

following scene presents itself. EQB, having used a mixing

zone analysis in past cases, neglected to include such a

-11-

provision in its latest certification for this facility. EQB

had previously used a mixing zone analysis for this very

facility; and far from abandoning the concept, EQB was in the

process of revising its regulations to prescribe such an

analysis at the very time it was preparing the Company's

certification. Four days before it issued the final

certification in this case, omitting a mixing zone provision,

it formally promulgated its new mixing zone regulations.

It is not clear whether in August 1990 EPA appreciated

that EQB had probably misstepped. The Company's brief

implies that the EPA, having obtained EQB's final

certification, then proceeded with sinister speed--surely a

rare accusation in administrative law--to mousetrap the

Company by issuing a final permit before EQB's certification

could be revised. An alternative explanation, to us entirely

plausible, is that the EPA's patience with EQB had been

exhausted and it wanted, as it had warned almost a year

before, simply to get done with the permit as soon as it had

EQB's final certification.

However this may be, both the Company and EQB made clear

to the EPA at once, and before the final permit issued, that

reconsideration was under way. EPA published its new draft

permit for comment in August 1990; and in September 1990,

before the EPA issued the final permit on September 28, 1990,

EQB advised EPA (on September 7) that it was reconsidering

-12-

its certification and might alter it, and the Company wrote

letters (on September 10 and 21) begging the EPA to defer

final action until the EQB acted. The EPA nevertheless

proceeded to issue the final permit with no explanation for

its refusal to wait.

Even at this stage, it appears that EPA was free to

correct the problem on administrative review. There being no

fixed timetable, the regional administrator presumably had

discretion to defer action until EQB acted on the Company's

reconsideration request and, if a mixing zone analysis were

adopted by EQB in a revised certification, then to

incorporate this revision into the new permit. One of EPA's

regulations, 40 C.F.R. 124.55(b), which is discussed below,

seems to contemplate just such a situation. During this same

period EQB made crystal clear, by its resolution of November

28, 1990, and its formal letter of February 25, 1991, that it

was planning to reexamine its certification and did not want

the certification treated as final. Once again, EPA

proceeded to reject the pleas and reaffirm the permit, sans

mixing zone.

EPA has now explained its position at least three times

administratively and for a fourth time in this court. Each

time EPA deals deftly with the Company's procedural

objections by showing why some regulation allowed EPA to

await EQB's final certification, but to refuse to await EQB's

-13-

attempt to repair the certification, and allowed EPA to adopt

EQB's certification, but to reject EQB's retroactive attempt

to brand it as non-final. The only thing that is missing,

among this array of finely wrought explanations, is any

reason why the EPA should want to frustrate the EQB's clumsy,

long-delayed but increasingly evident desire to reconsider a

mixing zone analysis for this permit.

Assuredly, some explanation is called for. The mixing

zone analysis is not some freakish idea or whim of the Puerto

Rico authorities. According to EPA's Mixing Zones

publication, it is available for use in at least 49 states in

varying situations; and the Company said that the refinery in

question cannot operate if the permit limitations are

applied, without a mixing zone analysis, at the point that

the effluent enters the water. Patently, these

considerations of history and practical effect would, in a

rational decision, warrant at least some discussion. Motor

Vehicle Mfrs. Ass'n, 463 U.S. at 43 (agency may not "entirely

fail[] to consider an important aspect of the problem").

At oral argument, we inquired of counsel representing

the EPA whether there were other situations in which EPA had

refused to use a mixing zone analysis despite a state's

desire that such an analysis be used. Yes, we were told,

counsel for EPA knew of several such instances. On rebuttal,

the Company's counsel responded that there were indeed other

-14-

instances but they were limited to EPA's issuance of permits

in Puerto Rico, in the same time frame as this case and to

other applicants whose situations paralleled that of the

Company. If this is the situation (counsel for EPA made no

later effort to respond), then EPA's current posture is in

some measure at odds with precedent. Cf. Atchison, T &

S.F.R.R. v. Wichita Bd. of Trade, 412 U.S. 800, 808 (1973)

("departure from prior norms" must be explained).

The point is not that EPA has some overriding obligation

under the Clean Water Act to do whatever it is that the state

wants to do. On the contrary, EPA was entirely free, once

Puerto Rico had ignored the clear deadlines for a final

certification, to treat the Commonwealth as an interested

bystander with no further veto authority. What is beyond

explanation, or at least wholly unexplained, is why EPA

should be intent on adopting half of what the Commonwealth

wanted while systematically frustrating its attempt to secure

the other half. The obligation, we repeat, is not one of

deference to local authorities but of making sense.

There is also in this case an element of apparent

irrational discrimination. See, e.g., Green Country

Mobilephone, Inc. v. FCC, 765 F.2d 235 (D.C. Cir. 1985)

(obligation to treat similar cases similarly). For all that

appears, similarly situated facilities in Puerto Rico, if

permitted for the first time next year, are likely to receive

-15-

permits including a mixing zone analysis. Like facilities in

other states, permitted in September 1990 at the same time as

the Company, probably received the benefit of mixing zone

analyses. Only Puerto Rican facilities that happened to be

permitted or re-permitted in this strange "window," during

which EQB was reformulating its mixing zone criteria, are

left out in the cold--possibly forever if the anti-

backsliding provisions apply.2

Perhaps there is some explanation for EPA's action other

than a mechanical desire to reach a rapid conclusion without

regard to whether the result is sound. Indeed, we suspect

that there is an explanation. As noted, the Company

insinuates that EPA deliberately took advantage of EQB's

carelessness to mousetrap the Company into standards that

could not later be relaxed because of the anti-backsliding

provisions previously mentioned. Such a result would at

least explain what happened, although it is doubtful that the

explanation, if adopted by EPA, would commend itself to a

reviewing court.

Or, there may be more benign reasons for EPA's action.

Perhaps the Company's science is faulty and very slight

adjustments in technology would permit it to meet the

2Needless to say, we do not know whether the anti-
backsliding provisions would produce this result. The
provisions are complicated and contain certain exceptions.
33 U.S.C. 1342(o). The Company's prediction is qualified,
and EPA's brief is silent on this issue.

-16-

pollution limitations, and improve the environment to boot,

without any mixing zone analysis. In all events, until EPA

emerges from its fortress of procedural-rule citations and

adopts a rationale for its action, any speculations are

beside the point: the agency's decision cannot be supported

on reasoning that the agency has not yet adopted. See SEC v.

Chenery Corp., 332 U.S. 194, 196 (1947).

We turn now to the Company's other arguments on appeal

because some of them, if adopted, would alter the terms of

the remand. The main thrust of the Company's various

arguments is that, for various procedural reasons, EPA was

not entitled to rely on the EQB certification. On this

premise, the Company argues that EPA was required to

formulate its own permit standards based upon the real

requirements of Puerto Rico law, which the Company believes

requires the use of a mixing zone analysis. Since we reject

the Company's premise of procedural error, the further steps

in the Company's argument need not concern us.

The Company's broadest procedural argument is that

Puerto Rico's final certification came too late and therefore

could not furnish the basis for EPA's own final permit. As

already noted, the Clean Water Act required Puerto Rico to

provide its certificate, or announce a decision not to

certify, within a reasonable time not to exceed one year

after the application, 33 U.S.C. 1341(a)(1); and by

-17-

regulation EPA required a certification decision within 60

days of the issuance of a draft permit. 40 C.F.R.

124.53(c)(3). Here, EQB apparently ignored both time limits,

failing both to meet the statutory one-year deadline and the

regulation-based 60-day deadline.

Under the statute and the regulation, the price of

failing to meet the deadlines is that the state agency waives

its right to dictate permit terms that go beyond what EPA

would do on its own. Based on this waiver language, the

Company argues that a state certification issued after the

deadline is without legal effect. In reply EPA says it is

free either to declare a waiver or, instead, to follow the

course taken in this case and await the final, though

belated, certification. The statute itself merely provides

that the state must act within a reasonable period, not to

exceed a year, or the certification requirement will be

deemed "waived." 33 U.S.C. 1341(a)(1).

Although we are provided no useful precedent or

legislative history, our reading of the statute largely

coincides with that of EPA. The statutory time limit and the

word "waived" do not tell us the answer; Congress could have

meant that a state certification issued after the deadline

had to be ignored by EPA, or it could have meant only that

EPA was free to do so. EPA interprets the statute to mean

the latter and under the Chevron doctrine, Chevron U.S.A.,

-18-

Inc. v. NRDC, 467 U.S. 837 (1984), its view is entitled to

weight. State of California v. FERC, 966 F.2d 1541 (9th Cir.

1992), cited by the Company as holding that the deadline

cannot be waived, holds no such thing.3

Further, EPA's reading both of the statute and its

regulation seems to us a sensibly flexible one. EPA's

reading gives it the practical benefit of the state process

even if that benefit comes a little late. Indeed, where no

one complains (e.g., because the applicant is happy to

operate under an earlier permit), it could be pointlessly

rigid to insist that EPA begin its own calculations the

moment the certification deadline expires for the state. The

concern on the other side is that without a deadline, a new

applicant could be left dangling forever. But we think the

courts have adequate power to assure that flexibility does

not become an excuse for permanent inaction.4

3EPA's interpretation of its own 60-day regulation is
even more compelling since it wrote the regulation.
Gardebring v. Jenkins, 485 U.S. 415, 430 (1988) In addition,

agencies can usually (although not always) waive their own
procedural regulations even where there is no express
provision for waiver. American Farm Lines v. Black Ball

Freight Service, 397 U.S. 532, 538 (1970).

4See Administrative Procedure Act, 5 U.S.C. 706(1)

(power to compel agency action unduly delayed). The courts
are normally deferential to the agency in such cases. See,

e.g., Telecommunications Research & Action Center v. FCC, 750

F.2d 70 (D.C. Cir. 1984). Here, however, Congress has
expressed its intent that the state proceeding be completed
in a year. If EPA wants to waive the state's failure to meet
a deadline, and wait longer for its certification, we think
that the propriety of its deferral might be open to judicial

-19-

The Company's remaining arguments require less

discussion. The claim that EQB's certification was not final

when EPA adopted it is unpersuasive. "Finality" is a concept

with several shades of meaning in administrative law; but

where, as here, the agency itself (rather than a subordinate

body) has spoken and has explicitly labeled its action

"final," we think that is enough, even though the agency may

choose to reconsider or may be reversed on judicial review.

The Company failed to get a stay of the EQB certification

before EPA acted in reliance upon it. We agree with EPA that

the subsequent decision of EQB to re-characterize its

certification order as non-final cannot affect the procedural

validity of EPA's decision to grant the permit.

In fact, EPA has regulations that govern the effect of a

state stay or modification of a certification after a permit

has issued. The pertinent regulation permits EPA's regional

administrator under certain circumstances to incorporate the

modifications into the permit so long as the state agency

stays or modifies the old certificate and forwards a new one

to EPA as a substitute. 40 C.F.R. 124.55(b). But this

regulation does not apply in this case because EQB never sent

a substitute certificate to the EPA.

The Company relies upon a different EPA regulation, 40

C.F.R. 122.44(d)(3). This provides in part that if a state

review that is somewhat more searching than customary.

-20-

court or board stays a certification, EPA shall notify the

state that certification will be deemed waived unless a

finally effective certificate is issued within 60 days;

absent such a new certification, the regulation says that EPA

shall impose its own requirements in the permit. In

agreement with EPA, we read this regulation to apply only to

stays that occur before EPA has issued its own permit. Once

again, the agency's reading of its own regulation is entitled

to deference. Gardebring, 485 U.S. at 430. Its reading also

has the benefit of making this regulation, governing pre-

permit stays, dovetail with section 124.55(b), governing

post-permit stays.

In an attempt to bolster the importance of the EQB stay,

the Company reminds us of the central role that the states

were intended to play under the Clean Water Act. Yet that

role is to be played within the framework of the procedures

fixed by the statute and EPA regulations. Indeed, precisely

because two different jurisdictions are expected to

collaborate on a permit, there is a special need for

compliance with the rules of the road. Here, the EQB stay

came after the permit and--strictly from a procedural

standpoint--EPA was entitled to disregard it, unless and

until EPA's regulation governing a post-permit stay was

satisfied.

-21-

In summing up, we stress again that the flaw in EPA's

action is not a procedural defect. EPA's result is

irrational, or at least inadequately explained, not because

of EQB's hapless stay, but because of the substance of the

EPA's permitting decision. To restate the gist of the

matter, EPA has failed to explain why it makes sense, as a

matter of substantive policy, to frustrate Puerto Rico's

incipient desire to use the mixing zone analysis, and why

those companies who fall in this "window" between Puerto

Rico's old and new regulations should alone be denied the

benefits of a mixing analysis. Those concerns would be

virtually the same even if EQB had never used the word

"stay."5

III. CONCLUSION

In framing the remand, we begin by emphasizing what we

have not decided. Whether the final certification issued by

the EQB in August 1989 is vulnerable to attack under Puerto

Rican law, if not altered by EQB on reconsideration, is an

issue not before this court. Although state certification

provisions are incorporated into federal permits, review of a

5We have not discussed the Company's separate claim that
EPA abused its discretion by not extending the comment period
for 15 days, as requested by the Company, to permit more time
for comment on technical issues. This argument, summarily
stated in a paragraph at the end of the Company's brief, is
not seriously supported and is therefore not preserved for
review. United States v. Zannino, 895 F.2d 1, 27 (1st Cir.),

cert. denied, 494 U.S. 1082 (1990).

-22-

state certification is a matter for local courts. Roosevelt

Campobello Int'l Park Comm'n v. EPA, 684 F.2d 1041, (1st Cir.

1982). The apparent past and future inclination of EQB to

employ mixing zone analyses is part of the background of this

case, but nothing we have said should be taken to declare the

law of Puerto Rico on this subject.

Similarly, we do not suggest that mixing zone analysis

has a sacrosanct role under the Clean Water Act. Our

impression from EPA's own publication is that the use of such

analysis is widespread. But that impression is subject to

correction. In any event, sound reasons may dictate that a

mixing zone analysis not be used in certain cases or certain

classes of cases, despite a possible hint to the contrary in

Marathon Oil Co., 830 F.2d at 1349 ("By definition, the

effluent itself does not meet water quality standards;

otherwise, it would not be considered polluted."). There may

even be reasons why, apart from EQB's procedural default, a

mixing zone analysis is improper in this case.

All that we hold here is that EPA's decision to issue a

permit in September 1990, adopting EQB's certification but

refusing to await EQB's decision on reconsideration, produces

a result that on the present record appears manifestly

arbitrary and capricious. If legitimate reasons exist for

such an outcome, then EPA is free to provide them and re-

adopt the present permit (and the Company in turn is free to

-23-

challenge those reasons and that action by petitioning again

for judicial review). EPA, EQB, and the Company may find it

possible to chart a more constructive course and make further

litigation unnecessary.

The EPA order adopting the permit at issue in this case

is vacated and the matter is remanded to EPA for further

proceedings in accordance with this opinion. Costs are taxed

in favor of the petitioner.

-24-