UNITED STATES of America, Appellee,

v.

MARATHON DEVELOPMENT CORPORATION and Terrence Geoghegan, Defendants, Appellants.

No. 88–1619.

United States Court of Appeals, First Circuit.

Heard Jan. 9, 1989.

Decided Feb. 8, 1989.

Stephen R. Delinsky with whom Treazure R. Johnson and Fine & Ambrogne were on brief, for appellants.

Richard E. Welch, III, Asst. U.S. Atty., with whom Frank L. McNamara, Jr., U.S. Atty., Andrew E. Lauterback, Sp. Asst. U.S. Atty., Edward J. Shawaker, Dept. of Justice, Ann Williams–Dawe, Sr. Asst. Regional Counsel, Region I, E.P.A., and Martin R. Cohen, Asst. Chief Counsel for Litigation, Army Corps of Engineers, were on brief, for appellee.

Roberta K. Schnoor, Asst. Atty. Gen., Environmental Protection Division, and James M. Shannon, Atty. Gen., on brief for the Com. of Mass., the States of Alaska, Md., Mo., Wis., Vt., the Pennsylvania Dept. of Environmental Resources, the Rhode Island Dept. of Environmental Management and the National Wildlife Federation, amici curiae.

Before CAMPBELL, Chief Judge,
COFFIN and BOWNES, Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

Marathon Development Corporation ("Marathon"), a Rhode Island real estate development corporation, and Terrence Geoghegan, its senior vice-president, were indicted on 25 counts of violating the Clean Water Act of 1977, 33 U.S.C. §§ 1251 *et seq.* (1982). *See* 33 U.S.C. § 1319(c) (specifying criminal penalties).[1] According to the government, Marathon, acting through Geoghegan, was engaged in developing a large shopping mall in southeastern Massachusetts, on a site that contained more than 20 acres of federally protected wetlands. In February 1986, Marathon was notified by the Army Corps of Engineers ("the Corps"), which administers relevant aspects of the Clean Water Act, that under the Act, Marathon could not deposit dredged or fill material into the wetlands without first obtaining a permit from the Corps. Despite this notification, Marathon, between June and September 1986, bulldozed more than five acres of wetlands clear of all vegetation, and piled debris and deposited gravel onto the wetlands. According to the government, the area leveled by Marathon roughly approximated the area designated for the shopping mall's parking lot.

Before trial, defendants raised the defense that their activities were protected by a "headwaters nationwide permit" set forth in the Corps' regulations, 33 C.F.R. § 330.5(a)(26) (1986). If such a nationwide permit were applicable to their activities, defendants would not be required to obtain an individual permit from the Corps. The government filed a motion in limine to exclude any evidence relating to the alleged

---

1. The criminal enforcement provisions of the Clean Water Act were amended by the Water Quality Act of 1987. The amendments are not applicable to this case.

nationwide permit. The government argued that the evidence would be irrelevant because the headwaters nationwide permit was not applicable in Massachusetts at the time of defendants' actions. The district court granted the motion in limine.

█ Defendants then entered conditional pleas of guilty under Fed.R.Crim.P. 11(a)(2), preserving for appeal the single issue of whether the headwaters nationwide permit was applicable in Massachusetts. In pleading guilty, defendants admitted to the conduct charged in the indictment. The district court fined Marathon $100,000. The court imposed on Geoghegan a suspended six-month sentence, one year of probation, and a $10,000 fine. Marathon and Geoghegan now appeal to us on the single issue they preserved. We agree with the district court's conclusion that the headwaters nationwide permit was not applicable in Massachusetts, and affirm the convictions.

The Clean Water Act was enacted to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Under 33 U.S.C. §§ 1311(a) and 1362, any discharge of dredged or fill material, such as dirt and gravel, into the nation's waters is unlawful unless authorized by a permit issued by the Corps, pursuant to section 404 of the Act ("Permits for dredged or fill material"). The nation's waters protected by the Act have been broadly construed so as to include wetlands. See United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 131–39, 106 S.Ct. 455, 461–65, 88 L.Ed.2d 419 (1985).

Wetlands are areas inundated or saturated with surface or ground water, including swamps, marshes, and bogs. The Army Corps of Engineers has recognized that wetlands "play a key role in protecting and enhancing water quality." Riverside Bayview Homes, 474 U.S. at 133, 106 S.Ct. at 463. As this court has noted,

Freshwater wetlands are ecologically valuable for various reasons. They act as a natural flood control mechanism by slowing and storing storm water runoff. They help supply fresh water to recharge groundwater supplies. They serve as biological filters by purifying water as it flows through the wetlands. They provide seasonal and year-round habitat for both terrestrial and aquatic wildlife.

United States v. Cumberland Farms of Connecticut, Inc., 826 F.2d 1151, 1153 (1st Cir.1987) (citing 33 C.F.R. § 320.4(b) (1986)), cert. denied, —— U.S. ——, 108 S.Ct. 1016, 98 L.Ed.2d 981 (1988).

In monitoring the discharge of dredged or fill materials under the Clean Water Act, the Corps issues both individual permits, which require the making of individual applications, and general permits, which do not require individual applications. The general permits, established pursuant to section 404(e) of the Act, 33 U.S.C. § 1344(e), allow categories of activities that the Corps determines will do little or no harm to the environment. General permits that have been established nationwide are called "nationwide permits." The "headwaters nationwide permit" on which defendants base their appeal is set forth in the Corps' regulations at 33 C.F.R. § 330.5 (a)(26):

§ 330.5  Nationwide permits.[2]

(a) Authorized activities. The following activities, including discharges of dredged or fill material, are hereby permitted provided the conditions listed in paragraph (b) of this section and the notification procedures, where required, of § 330.7 are met. Comment. Because some states have denied water quality certification/coastal zone consistency for some nationwide permits reissued herein and many states have granted conditional water quality certification, applicants should check with the district engineer regarding eligibility under the nationwide permits.

. . . .

(26) Discharges of dredged or fill material into the waters listed in paragraphs

---

**2.** These regulations for nationwide permits were promulgated on October 5, 1984, and were in force at the time of the conduct in question. Amended regulations became effective January 1, 1987, but are not applicable to the present convictions.

(a)(26)(i) and (ii) of this section except those which cause the loss or substantial adverse modification of 10 acres or more of waters of the United States, including wetlands. For discharges which cause the loss or substantial adverse modification of 1 to 10 acres of such waters, including wetlands, notification of the district engineer is required in accordance with § 330.7 of this part.

(i) Non-tidal rivers, streams, and their lakes and impoundments, including adjacent wetlands, that are located above the headwaters.

(ii) Other non-tidal waters of the United States, including adjacent wetlands, that are not part of a surface tributary system to interstate waters or navigable waters of the United States (i.e., isolated waters).

As noted above, defendants wished to present evidence at trial that their activities were allowed by this headwaters nationwide permit. They claim that the wetlands in question were adjacent to a channelized stream located above the headwaters,[3] and that their activities caused the "loss or adverse modification" of less than one acre, so that no individual permit or notification was required. If they had been permitted to show this, defendants argue, they would have had a complete defense to the charged crime. The government disputes defendants' contention that their activities fell within the terms of the headwaters nationwide permit, claiming that the wetlands in question were in fact adjacent to the Runnins River (a large, interstate waterway that is not located above the headwaters) and that more than five acres were adversely affected. But this factual dispute need not detain us here because we agree with the government that the headwaters nationwide permit was not in any event applicable in the Commonwealth of Massachusetts, as Massachusetts had denied the water quality certification that is requisite to the granting of a federal permit.

Under the Clean Water Act, states are empowered to set more stringent water quality standards than those set by the Act and its attendant regulations. Under section 401 of the Act ("Certification"), if a state determines that discharges from a certain category of activity will not meet state water quality requirements, the federal government is prohibited from authorizing the activity by federal permit: "No license or permit shall be granted if certification has been denied by the State...." 33 U.S.C. § 1341(a)(1). A state's ability to impose more stringent water quality standards is also ensured by 33 U.S.C. § 1370, which provides that any state may generally adopt a more stringent—although not a less stringent—"standard or limitation respecting discharges of pollutants" than that provided on a nationwide basis by the Clean Water Act. The Commonwealth of Massachusetts and its fellow amici curiae [4] contend that a state's authority to grant or deny water quality certification is central to its ability to ensure the protection of water resources within its borders.

The ability of states to enforce their own more stringent water quality standards by denying certification for a nationwide permit is consistent with the legislative purpose and history of the Clean Water Act. In stating the overall goals of the Act, Congress declared its policy "to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution." 33 U.S.C. § 1251(b). The legislative history of section 401 of the Act ("Certification") confirms that Congress intended to give the states veto power over the grant of federal

**3.** The term "headwaters" is defined as the "point on a nontidal stream above which the average annual flow is less than five cubic feet per second." 33 C.F.R. § 323.2(h) (1986).

**4.** The Commonwealth of Massachusetts was joined as amicus curiae by the states of Alaska, Maryland, Missouri, Wisconsin, and Vermont, the Pennsylvania Department of Environmental Resources, the Rhode Island Department of Environmental Management, and the National Wildlife Foundation. Each amicus state, in addition to Massachusetts, has either denied or set conditions upon the headwaters nationwide permit because it determined that the permit would authorize activities that would damage the water quality of the state's freshwater wetlands.

permit authority for activities potentially affecting a state's water quality. The predecessor of section 401 was section 21(b) of the Water and Environmental Quality Improvement Act of 1970. When it enacted section 21(b), Congress described its impact as follows:

No Federal license or permit shall be granted unless this [state] certification has first been obtained or there has been a waiver of this requirement as provided by this subsection. Denial of certification by a State ... results in a complete prohibition against the issuance of the Federal license or permit.

H.R.Conf.Rep. No. 940, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Admin.News 2712, 2741. Section 401 subsequently was enacted as part of the Federal Water Pollution Control Act Amendments of 1972. The Senate Committee that prepared this provision observed,

This section is substantially section 21(b) of existing law.... It should also be noted that the Committee continues the authority of the State ... to act to deny a permit and thereby prevent a Federal license or permit from issuing to a discharge source within such State....

S.Rep. No. 414, 92d Cong., 2d Sess., *reprinted in* 1972 U.S.Code Cong. & Admin. News 3668, 3735.

This court has agreed with this interpretation of the state's power. *See Roosevelt Campobello International Park Commission v. Environmental Protection Agency*, 684 F.2d 1041, 1056 (1st Cir.1982) ("Section 401(a) of the Clean Water Act empowers the state to certify that a proposed discharge will comply with the Act and 'with any other appropriate requirement of State law.' Any such requirement 'shall become a condition on any Federal license or permit.' § 401(d)."). *Accord* 1 Grad, *Treatise on Environmental Law* § 3.03, at 3–219 (1983) ("The certification requirement provides the states with a first line of defense against federally licensed or per-

mitted activities that may have adverse effects on the state's waters").

Neither the language nor the history of section 404(e) of the Clean Water Act ("General permits [for dredged or fill material] on State, regional, or nationwide basis"), 33 U.S.C. § 1344(e), suggests that states have any less authority in respect to general permits than they have in respect to individual permits. Indeed, at the same time that Congress authorized the Corps to issue general permits for dredged or fill material, it added a provision to section 404 which underlined the authority of states over dredge and fill activities:

Nothing in [section 404] shall preclude or deny the right of any State ... to control the discharge of dredged or fill material in any portion of the navigable waters [5] within the jurisdiction of such State....

33 U.S.C. § 1344(t). Although Congress reviewed section 401 ("Certification") when it authorized general permits in section 404 of the Clean Water Act of 1977, it did not amend section 401 so as to limit state authority over nationwide or other general permits. When sections 401 and 404 are read together, their plain terms provide that the state certification requirement of section 401 applies to section 404(e) nationwide permits in the same way that it applies to any other section 404 permit.

In this case, there is no dispute that Massachusetts had denied water quality certification of the headwaters nationwide permit, several months before its promulgation. When the Corps published its 1984 regulations, which included the headwaters nationwide permit, the Corps gave public notice that this permit was not applicable in Massachusetts:

The state of Massachusetts has denied 401 water quality certification ... for nationwide permits ... [including] (26) [the headwaters permit]. Department of the Army authorization to undertake these activities ... within the state of Massachusetts has been denied without prejudice. Individuals wishing to under-

---

5. References to "navigable waters" in the Clean Water Act have generally been interpreted to refer to all of the nation's waters, including wetlands. *See United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 131–39, 106 S.Ct. 455, 461–65, 88 L.Ed.2d 419 (1985).

take these activities must obtain the 401 certification ... from the appropriate state office prior to seeking Department of the Army authorization.

Defendants do not contend that they were not notified of the state's denial or of the Corps' requirements.

In response to the abundant evidence that the nationwide permit was not applicable in Massachusetts, defendants make three arguments, which we now discuss. We find no merit in any of them.

■ First, defendants argue that section 401(a) of the Clean Water Act, which provides for state water quality certification, applies only to individual permits, not to general permits. They note that the first sentence of section 401(a)(1) refers to "applicants" for permits:

> *Any applicant* for a Federal license or permit to conduct any activity ... which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate, ... that any such discharge will comply with the applicable provisions ... of this title.

33 U.S.C. § 1341(a)(1) (emphasis added). Defendants observe that while people must "apply" for individual permits, the general permits (including nationwide permits) require no such "application" to the Corps. As a result, they contend, people who seek to engage in activity under a general permit cannot be considered "applicants."

To this argument there is a simple and, we believe, conclusive answer. The last sentence of section 401(a)(1) provides, *"No license or permit shall be granted if certification has been denied by the State...."* 33 U.S.C. § 1341(a)(1) (emphasis added). Defendants do not mention this sentence in their brief. At oral argument defendants' counsel said that he read the sentence as still referring to "applicants." But if that were the case, the sentence would be pure surplusage, adding nothing to the meaning

of the section. Instead, we interpret the sentence as meaning exactly what it says: that *no* license or permit—whether individual or general—shall be granted if the state has denied certification. Such an interpretation accords not only with the plain meaning of the sentence, but also with the legislative purpose and history outlined above. Such an interpretation also accords with the Corps' own consistent interpretation of the statute. "An agency's construction of a statute it is charged with enforcing is entitled to deference if it is reasonable and not in conflict with the expressed intent of Congress." *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 131, 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1985) (citations omitted).

■ Second, defendants argue that the Corps regulation concerning the headwaters nationwide permit does not condition its applicability on state water quality certification. Although the regulations include a "Comment" advising applicants that some states have denied water quality certification for some nationwide permits, 33 C.F.R. § 330.5(a) (*see* page 98, *supra*), this "Comment" is not part of the regulation itself and, therefore, has no substantive effect.[6] But the fact that the regulation does not explicitly condition the applicability of the headwaters nationwide permit on state water quality certification does not help defendants. As noted above, the statute itself prohibits the issuance of a nationwide permit if the relevant water quality certification has been denied. The "Comment" is simply one way in which the Corps provided notice of this provision of the law.

■ Finally, defendants argue that those provisions of the Clean Water Act that allow states to impose their own more stringent water quality standards violate the constitutional guarantee of equal protection of the laws. Defendants observe that if individual states can prevent the grant of a nationwide permit, "identical

---

**6.** In the 1987 amendment of the regulations, this "Comment" was incorporated into the regulations themselves. We do not agree with defendants' suggestion that the fact of this amend-

ment shows that prior to the amendment the "Comment" must have purported to have substantive force.

discharges, occurring in two different states, would result in drastically different consequences for the individuals responsible for the respective discharges." Although this observation may well be correct, it hardly amounts to a denial of equal protection. Permitting states to impose, in the context of a federal law, their own more stringent environmental standards is not unique and has never been held to be irrational or unconstitutional. *See, e.g.,* Clean Air Act, 42 U.S.C. §§ 7410, 7413(c)(1)(A) (1982) (states may set more rigorous air quality standards than federal minimum and federal government may prosecute knowing violations of those standards). *See also United States Steel Corp. v. Train,* 556 F.2d 822, 835 (7th Cir.1977) (Clean Water Act); *Union Electric Co. v. Environmental Protection Agency,* 515 F.2d 206 (8th Cir.1975), *aff'd,* 427 U.S. 246, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976) (Clean Air Act). Far from being irrational, such provisions enable a state to assess its need for stronger environmental policies in the context of its own unique environmental problems.

We also reject defendants' argument that the discretionary nature of the Massachusetts certification process poses special constitutional concerns. Any defect in a state's section 401 water quality certification can be redressed. The proper forum for such a claim is state court, rather than federal court, because a state law determination is involved. *See Roosevelt Campobello International Park Commission v. Environmental Protection Agency,* 684 F.2d 1041, 1056 (1st Cir.1982).

Because we conclude that the headwaters nationwide permit was not applicable in Massachusetts at the time of defendants' actions, we hold that the district court was correct in granting the government's motion in limine to exclude any evidence relating to the permit. Any such evidence would have been entirely irrelevant, and could have led only to confusion and delay.

*AFFIRMED.*