# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 9, 2011           Decided July 22, 2011

No. 09-1001

LAKE CARRIERS' ASSOCIATION,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

CENTER FOR BIOLOGICAL DIVERSITY, ET AL.,
INTERVENORS

———

Consolidated with 09-1010, 09-1076, 09-1115

———

On Petitions for Review of a Final Action
of the Environmental Protection Agency

———

*Barry M. Hartman* argued the cause for petitioners. With
him on the briefs were *Christopher R. Nestor* and *Shaun M.
Gehan.* *David E. Frulla* entered an appearance.

*Joel C. Mandelman* was on the brief for *amicus curiae*
Nutech 03, Inc. in support of petitioners.

*Martin F. McDermott*, Attorney, U.S. Department of Justice, argued the cause and filed the brief for respondents.

*Deborah A. Sivas*, *Allison LaPlante*, *Daniel P. Mensher*, and *Thomas Cmar* were on the brief for intervenors Northwest Environmental Advocates, et al. in support of respondents.

*Eric T. Schneiderman,* Attorney General, Office of the Attorney General for the State of New York, *Barbara D. Underwood*, Solicitor General, *Monica B. Wagner*, Assistant Solicitor General, *Lisa Burianek*, Deputy Bureau Chief, *Michael Myers*, Section Chief, *Bill Schuette*, Attorney General, Office of the Attorney General for the State of Michigan, *John J. Bursch*, Solicitor General, and *Robert P. Reichel*, Assistant Attorney General, were on the brief for *amici curiae* States of New York and Michigan.

Before: GARLAND and GRIFFITH, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed Per Curiam.

PER CURIAM: Trade associations representing commercial ship owners and operators petition for review of a nationwide permit issued by the Environmental Protection Agency (EPA) for the discharge of pollutants incidental to the normal operation of vessels. The petitioners raise a number of procedural challenges, all related to EPA's decision to incorporate into the permit conditions that states submitted to protect their own water quality. Because we find that the petitioners have not shown that the additional procedures they request would have had any effect on the final permit, we deny the petition for review.

I

Section 301(a) of the Clean Water Act (CWA) prohibits "the discharge of any pollutant by any person" into the waters of the United States, except in compliance with the terms of the Act. 33 U.S.C. § 1311(a). Section 402(a) provides one way in which such discharges may take place without violating the CWA. Under that section, EPA may issue a National Pollutant Discharge Elimination System (NPDES) permit "for the discharge of any pollutant . . . , notwithstanding section [301(a)] . . . , upon condition that such discharge will meet . . . all applicable requirements . . . of [the CWA]." *Id.* § 1342(a)(1). EPA regulations explain that permits may be individual (covering discharges from a single source, 40 C.F.R. § 122.21), or general (covering "one or more categories or subcategories of discharges . . . within a geographic area," *id.* § 122.28(a)). Each permit must set out the specific conditions necessary to ensure that the permit holder's discharge of pollution will comply with the water standards mandated by the CWA. 33 U.S.C. § 1342(a)(2).

In conjunction with the permitting process, the CWA gives states an express role in approving or barring discharges into their navigable waters, and in setting out the conditions under which such discharges may occur. Section 401 of the CWA states that any applicant for a federal permit to conduct any activity that "may result in any discharge into the navigable waters, shall provide the . . . permitting agency a certification from the State in which the discharge originates or will originate . . . that any such discharge will comply with" national and EPA-approved state water quality standards. 33 U.S.C. § 1341(a). The state must also set forth in its certification "any effluent limitations and other limitations . . . necessary to assure" that the permit holder "will comply" with CWA standards "and with any other appropriate requirement of State

law." *Id.* § 1341(d). These limitations "shall become a condition" on any federal permit, *id.*, and no "permit shall be granted if certification has been denied," *id.* § 1341(a).

The CWA defines "discharge of a pollutant" as, inter alia, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). A "point source" includes a "vessel or floating craft," *id.* § 1362(14), and "pollutant" is defined to include "sewage from vessels," *id.* § 1362(6). Thus, discharges from vessels are regulated by the permitting and certification scheme set out above.

Shortly after the CWA was enacted, EPA promulgated a regulation exempting incidental vessel discharges from the permitting (and therefore the certification) requirements of the Act. Exempted discharges included "sewage from vessels, effluent from properly functioning marine engines, laundry, shower, and galley sink wastes, or any other discharge incidental to the normal operation of a vessel." 40 C.F.R. § 122.3(a). The regulation was in force for more than thirty years. Then, in 2008, the Ninth Circuit affirmed a district court decision vacating the regulation, finding that EPA lacked authority to exempt incidental vessel discharges. *Northwest Envtl. Advocates v. EPA*, 537 F.3d 1006 (9th Cir. 2008). After a stay to allow EPA time to implement a means of issuing permits for vessel discharges, the regulation was finally vacated on February 6, 2009.

In response to the Ninth Circuit's decision, EPA developed a general permit, pursuant to section 402 of the CWA, to cover the incidental vessel discharges previously exempted by the regulation. *See* Final National Pollutant Discharge Elimination System (NPDES) General Permit for Discharges Incidental to the Normal Operation of a Vessel, 73 Fed. Reg. 79,473 (Dec. 29,

2008).[1]  The agency estimated that the Vessel General Permit (VGP) would cover discharges from approximately 61,000 domestic-flagged commercial vessels and 8,000 foreign-flagged vessels.  *Id.* at 79,481.  And unlike the majority of permits issued under section 402, which cover discharges originating in only a single state, the VGP would cover discharges in waterways throughout the United States.

EPA published a draft VGP on June 17, 2008, and established a 45-day comment period.  Draft NPDES General Permits for Discharges Incidental to the Normal Operation of a Vessel, 73 Fed. Reg. 34,296 (June 17, 2008).  The draft permit set out all of the general EPA-mandated conditions for vessel discharges, and indicated that the agency was seeking certifications from each of the states pursuant to section 401. U.S. EPA, PROPOSED GENERAL PERMIT (2008), at 53 (J.A. 286); *see* Draft NPDES General Permits, 73 Fed. Reg. at 34,302.  The draft permit did not, however, include any of the certification conditions to be imposed by the states pursuant to section 401. 73 Fed. Reg. at 34,302.

EPA received more than 170 comments on the draft permit. Many suggested that, because state water standards differ, the state certifications might result in conflicting conditions being attached to the permit, thus unduly hindering vessels seeking to remain in compliance as they move between the waters of

---

[1]Also in response to the Ninth Circuit's decision, Congress passed two acts that exempted small boats and recreational and commercial fishing vessels from the CWA's permitting requirements. *See* Clean Boating Act of 2008, Pub. L. No. 110-288, 122 Stat. 2650 (exempting recreational vessels); Permits for Discharges from Certain Vessels, Pub. L. No. 110-299, 122 Stat. 2995 (2008) (granting a two-year exemption for vessels less than 79 feet long and all commercial fishing vessels).

different states. Some comments suggested that a single uniform standard was necessary to minimize the burden on interstate commerce. EPA acknowledged these comments, but responded that the statute required certifications by the states in which the discharges would originate and mandated that EPA attach to the permit any conditions the states deemed necessary to meet their specific water quality standards. Therefore, EPA concluded, it could neither evade the certification process nor alter certification conditions imposed by the states. EPA Response to Comments, at 14 (J.A. 1052-91).

Twenty five states, two tribes, and one territory certified the draft VGP and attached state-specific conditions. (The other states, with the exception of Alaska and Hawaii, either certified without conditions or waived their right to certify.) On December 19, 2008, EPA's final VGP became effective. Final NPDES General Permit, 73 Fed. Reg. at 79,474. Part VI of the permit, which was not included in the draft VGP, is composed of approximately 100 state certification conditions. U.S. EPA, VESSEL GENERAL PERMIT (VGP) (2008), at 62-104 (J.A. 825-67). Vessels covered by the permit are required to adhere to the general provisions of the VGP with respect to all discharges, and are further required to adhere to any Part VI certification condition imposed by a state into the waters of which the vessel is discharging pollutants.

In 2009, Lake Carriers' Association, Canadian Shipowners Association, and American Waterways Operators filed petitions for review of the final VGP. The petitions were consolidated into the single suit now before us. The trade associations raise three challenges. First, they contend that EPA erred in failing to provide notice and an opportunity for comment on the final VGP, which contained the state certification conditions. Second, they charge that it was arbitrary and capricious for EPA to issue the permit without considering the possible ill-effects of

the state certification conditions. Finally, they allege that EPA failed to consider the costs of compliance with state conditions in assessing the impact of the permit on small businesses, as required by the Regulatory Flexibility Act (RFA), 5 U.S.C. § 601 *et seq.*[2] The standard of review for these challenges is governed by the Administrative Procedure Act (APA), pursuant to which we determine whether the agency's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and whether the permit was promulgated "without observance of procedure required by law," *id.* § 706(2)(D). *See Owner-Operator Independent Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 198 (D.C. Cir. 2007).

II

The petitioners' primary contention is that EPA failed to provide notice and an opportunity for comment before promulgating the final permit, as required by the APA, 5 U.S.C. § 553. EPA did provide for notice and comment regarding the draft VGP, but the petitioners argue that this was insufficient because the draft contained only the general EPA-mandated conditions for vessel discharges; it contained none of the more than 100 state certification conditions that were appended to the final permit. The petitioners allege that they were therefore deprived of the opportunity to comment regarding the potential conflicts and burdens created by the cumulative effects of the state conditions.

---

[2]The petitioners satisfy the requirements for associational standing because at least one member of each association would have standing to sue in its own right; the interests they seek to protect are germane to their purpose; and neither the claim asserted nor the relief requested requires that an individual member participate in this suit. *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).

A

EPA's first response to this contention is that section 401(a) of the CWA excuses it from providing an additional round of notice and comment regarding state certification conditions. Section 401(a) requires that a certifying state "shall establish procedures for public notice . . . and, to the extent it deems appropriate, procedures for public hearings" in connection with certification applications. 33 U.S.C. § 1341(a). EPA maintains that this statute-specific state review procedure supplants the APA's notice-and-comment requirements.

This argument is unpersuasive. The APA instructs that a "[s]ubsequent statute may not be held to supersede or modify [the APA's requirements] . . . except to the extent that it does so expressly." 5 U.S.C. § 559. Accordingly, although an agency is excused from § 553's mandate when a subsequent statute "plainly expresses a congressional intent to depart from normal APA procedures." *Asiana Airlines v. FAA*, 134 F.3d 393, 398 (D.C. Cir. 1998), "[w]e have looked askance at agencies' attempts to avoid the standard notice and comment procedures, holding that exceptions under § 553 must be 'narrowly construed and only reluctantly countenanced,'" *id.* at 396 (quoting *New Jersey v. EPA*, 626 F.3d 1038, 1045 (D.C. Cir. 1980)). We doubt that section 401's requirement that states provide for notice and comment regarding proposed conditions constitutes the requisite "plain express[ion]" of congressional intent to supersede the APA's requirements.[3]

---

[3]EPA also contends that the APA's notice-and-comment requirements do not apply to the Vessel General Permit because it is not a rule. As the agency recognizes, this contention runs headlong into our decision in *National Ass'n of Home Builders v. U.S. Army Corps of Engineers*, in which we held that a nationwide permit issued under a different provision of the CWA was a rule within the meaning

9

B

We do find persuasive, however, EPA's argument that the petitioners have failed to show that EPA has power to amend or reject the state certifications at issue in this case, and have thus failed to establish that additional opportunity for comment would have served any purpose. Notably, the petitioners never argued that the certifications failed to "compl[y] with the terms of section 40l," *City of Tacoma v. FERC*, 460 F.3d 53, 67 (D.C. Cir. 2006), by overstepping the traditional bounds of state authority to regulate interstate commerce. We therefore need not consider whether EPA has authority to reject state conditions under such circumstances. Instead, the petitioners contend that providing for notice and comment would not be purposeless in this case on two other grounds, neither of which is availing.

1. First, they maintain that "[t]he plain language of sections 401 and 502 of the CWA instruct[s] that a section 401 certification" for a permit covering mobile point sources with discharges in multiple states must be made by the Administrator of EPA instead of by the states. Reply Br. 13. For such a permit, they contend, the Administrator may accept input from affected states but is not bound to include state-specific certification conditions. Pet'rs Br. 38. In support, the petitioners cite a sentence in section 401(a)(1) that provides: "In any case where a State or interstate agency has no authority to give such a certification, such certification shall be from the Administrator." 33 U.S.C. § 1341(a)(1). They also note that section 401 repeatedly uses the terms "state" and "certification" in the singular. And they further cite section 401(a)(2), which, although it establishes a procedure for dealing with cases in

---

of the APA. 417 F.3d 1272, 1284-85 (D.C. Cir. 2005). In light of the conclusion we reach in the following paragraphs, we need not address EPA's efforts to distinguish that decision.

which "a discharge" originating in the waters of one state "affect[s] . . . the quality of the waters of" another, does not give section 401 certification authority to the affected state. *Id.* at § 1341(a)(2); *see* Pet'rs Br. 36-37.

The long answer to this argument would require an analysis of the statutory language. EPA argues that the cited sentence from section 401(a)(1) gives the Administrator power to certify a permit when a state lacks authority to do so under its own law, not where no single state can certify for multistate discharges.[4] In any event, the agency continues, no single state does certify for multistate discharges under the VGP. Each state's certification applies only to discharges in its own waters, and a state does not lose authority to certify such a discharge simply because a vessel moves and then discharges in another state as well. Nor, the agency maintains, is the fact that section 401 is written in the singular persuasive: The Dictionary Act states that, "unless the context indicates otherwise -- words importing the singular include and apply to several persons, parties, or things." 1 U.S.C. § 1. Finally, EPA notes, section 401(a)(2) is not relevant to this question: It applies when a single point of discharge in one state may affect the waters of another state (when, for example, a pollutant is carried downstream across

---

[4] *Cf. United States v. Marathon Dev. Corp.*, 867 F.2d 96, 99-101 (1st Cir. 1989) (rejecting a claim that section 401(a)'s certification requirement "applies only to individual permits, not to general [nationwide] permits," and holding that a Corps of Engineers nationwide permit was inapplicable to discharges in Massachusetts because the state had denied the requisite certification); *id.* at 99-100 (finding that "Congress intended to give the states veto power over the grant of federal permit authority for activities potentially affecting a state's water quality").

state lines), not when a vessel makes repeated discharges into the waters of several states.

But there is a short answer to the petitioners' textual argument: they did not make it before the agency, and they have therefore waived it. The petitioners' comments on the draft VGP did not contain *any* of the textual arguments they now raise. Although the petitioners are correct that "[m]any commenters requested that EPA avoid the practical issues posed by numerous state conditions through a single promulgation," Reply Br. 25, none offered an interpretation of section 401 that would have permitted EPA to issue the certification in place of the states. And as we said in *Natural Resources Defense Council v. EPA*:

> We have previously held that failure to raise a particular question of statutory construction before an agency constitutes waiver of the argument in court. *See, e.g.*, *Ohio v. EPA*, 997 F.2d 1520, 1528 (D.C. Cir. 1993); *Linemaster Switch Corp. v. EPA*, 938 F.2d 1299, 1308 (D.C. Cir. 1991). In those cases, the parties were not saved by the fact that they had made other "technical, policy, or legal" arguments before the agency.

25 F.3d 1063, 1074 (D.C. Cir. 1994); *see Orion Reserves Ltd. Partnership v. Salazar*, 553 F.3d 697, 707 (D.C. Cir. 2009); *Nevada v. Dep't of Energy*, 457 F.3d 78, 88 (D.C. Cir. 2006); *Nat'l Mining Ass'n v. Dep't of Labor*, 292 F.3d 849, 874 (D.C. Cir. 2002).

2. The petitioners also argue that providing notice and an opportunity for comment would not have been "pointless" because "there are at least two ways that the state conditions, when considered together, create significant constitutional issues

that EPA failed to consider prior to issuing the VGP." Reply Br. 9, 11. "First, the VGP appears to require that some regulated entities violate one provision of the permit in order to comply with another, a conundrum prohibited by fundamental principles of due process." Pet'rs Br. 46. Second, the petitioners contend that the VGP may raise a problem under the "dormant Commerce Clause[,] [which] prohibits states from adopting laws that unduly burden interstate commerce." *Id.* at 47 (citing *Kassel v. Consol. Freightways*, 450 U.S. 662, 678 (1981)).

We are uncertain about exactly what the petitioners are arguing here. They do not contend that the CWA itself is unconstitutional, even as EPA construes it. Nor do they argue on this appeal that the VGP is unconstitutional, even as EPA has promulgated it.[5]

---

[5]We recognize that the petitioners are attempting to chart a difficult course on this appeal, which may account for the awkwardness of some of their arguments. As they explain in their brief, once the Ninth Circuit vacated the exemption for discharges incidental to the normal operation of vessels, such discharges "became subject to the discharge prohibition of section 301(a) of the CWA, 33 U.S.C. § 1311(a), unless covered under an NPDES permit." Pet'rs Br. 7. If EPA had "chose[n] not to create a permit system at all, these discharges, some of which inevitably occur . . . , would be illegal in their entirety under the CWA[,] . . .[and] shipping and other marine transportation would have come to a complete halt." *Id.* at 7-8. To avert such an outcome, "EPA decided to propose a nationwide general NPDES permit program for incidental vessel discharges," rather than utilizing vessel-by-vessel or state-by-state permits. *Id.* at 8. The advantage of a nationwide permit for companies that operate in multiple states is obvious, and may explain why the "[p]etitioners are not at this time challenging EPA's use of a CWA nationwide general permit," but instead "focus on the procedure followed by EPA in issuing the VGP." *Id.* at 34 n.14.

As to the due process contention, the petitioners are careful throughout to say only that it "*might be* impossible to comply with one [state's] condition without violating another," Pet'rs Br. 18 (emphasis added), not that it is impossible.[6] But without an inconsistency that makes it literally impossible to adhere to one state's requirements without breaching another's, it is hard to detect a due process violation on the face of the VGP.[7] Indeed, it is hard to imagine how an inconsistency of such magnitude could ever arise, given that "the state-specific conditions" in the VGP only "apply in the waters of the state that provided the conditions." EPA Response to Comments, at 14-2 (J.A.1053).

As to the dormant Commerce Clause, the petitioners claim only that "[a]llowing the specter of multiple states imposing differing requirements on vessels that move through their respective waters creates a . . . *potentially* impermissible[] burden on commerce." Pet'rs Br. 22 (emphasis added). We note that even the italicized caveat is understated. Dormant Commerce Clause doctrine applies only to burdens created by *state* law. *See, e.g.*, *Kassel*, 450 U.S. at 678. At issue here is a federal statute, the CWA, and a federal regulation, the VGP. It is true, as the petitioners observe, that *Wyoming v. Oklahoma*

---

[6]*See also* Pet'rs Br. 18 (asserting that the "requirements added to the final VGP contain *potentially* conflicting requirements" (emphasis added)); *id.* at 45 (stating that the final VGP requirements are "*potentially* inconsistent" (emphasis added)); *id.* at 46 (observing that "the VGP *appears to* require that some regulated entities violate one provision of the permit in order to comply with another" (emphasis added)).

[7]EPA, the intervenors, and the state amici vigorously dispute the claim that Part VI of the VGP contains any such "'impossible' compliance dilemmas." EPA Br. 43; *see* Intervenors' Br. 37-38; States of New York and Michigan Amicus Br. 27-30.

held that it takes an "unambiguous" expression of intent for Congress to authorize a state to burden interstate commerce in a way that would otherwise transgress the dormant Commerce Clause. 502 U.S. 437, 458 (1992). But in *Wyoming* it was a state law that was challenged, and the question was whether a federal statute had authorized it. Here, it is a federal regulation that is at issue.[8] The CWA does not merely authorize state certifications; it incorporates those certifications into federal law. *See* Reply Br. 12 (acknowledging that, when the conditions attached by each state "are aggregated in the final VGP[,] [they] become federal requirements"); *cf. Arkansas v. Oklahoma*, 503 U.S. 91, 110 (1992).

Some passages in the petitioners' brief suggest that they may be making a "constitutional avoidance" argument, contending that EPA must "construe and apply section 401 in a manner" that avoids "creat[ing] significant constitutional issues." Pet's Br. 45-46 (citing, e.g., *Edward J. DeBartolo v. Fl. Gulf Coast Bldg. Constr. Trades Council*, 485 U.S. 568, 574-75 (1988)). But that canon comes into play only when a contrary construction would raise "grave and doubtful constitutional questions." *Rust v. Sullivan*, 500 U.S. 173, 190-

---

[8] In addition, the state statute at issue in *Wyoming* violated the dormant Commerce Clause not simply by unduly *burdening* interstate commerce, as is claimed here, but by *discriminating* against it. 502 U.S. at 458. The Supreme Court scrutinizes statutes of the latter kind far more strictly than those of the former, *id*. at 454-55 & n.12, and there are suggestions in *Wyoming* that the "unambiguous" expression test was only intended for the latter, *see id.* (declaring that "Oklahoma has not met its burden of demonstrating a clear and unambiguous intent on behalf of Congress to permit the *discrimination* against interstate commerce occurring here," and that "Congress must manifest its unambiguous intent before a federal statute will be read to permit . . . *such a violation* of the Commerce Clause as Oklahoma here seeks to justify" (emphases added)).

91 (1991).  It has no applicability in a case like this one, in which "there is nothing to avoid" from a constitutional perspective. *Cablevision Sys. Corp. v. FCC*, No. 10-1062, 2011 WL 2277217, at *11 (D.C. Cir. June 10, 2011).

Perhaps the petitioners mean only to argue that EPA should have construed section 401 so as to avoid creating inconsistencies and burdens, even if such problems do not rise to the constitutional level.  But if that is what the petitioners mean, they do not say so.  More important, they do not point to any text that could be construed to this end.  The only text to which they advert in this portion of their brief is section 101 of the CWA, which states that the policy of the statute is to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution." 33 U.S.C. § 1251(b).  From this they infer that "section 401's certification process is designed to *preserve* state authority, not to expand it."  Pet'rs Br. 48 (internal quotation marks omitted). Whatever the validity of that inference, it still does not explain how the text of section 401 might be read to permit EPA to alter state certifications.  *Cf. Am. Trucking Ass'n v. EPA*, 600 F.3d 624, 628 (D.C. Cir. 2010) (rejecting a challenge to EPA's approval of California vehicle standards because the petitioners were "seeking improperly to engraft a type of constitutional Commerce Clause analysis onto EPA's . . . decision[] that is neither present in nor authorized by the statute" (internal quotation marks omitted)).[9]

---

[9]In a footnote to their reply brief, the petitioners observe that section 103 of the CWA tasks EPA to "'encourage the enactment of improved and, so far as practicable, uniform State laws relating to the prevention, reduction and elimination of pollution.'" Reply Br. 13 n.5 (quoting 33 U.S.C. § 1253).  The petitioners acknowledge that they did not mention this provision in their comments during the rulemaking, Oral Arg. Recording at 47:37, and, in any event,

Before concluding this Subpart, we note that EPA's resolution of this matter does not leave the petitioners without recourse. If they believe that the certification conditions imposed by any particular state pose an inordinate burden on their operations, they may challenge those conditions in that state's courts. *See Roosevelt Campobello Int'l Park Comm'n v. EPA*, 684 F.2d 1041, 1056 (1st Cir. 1982) (noting that "the courts have consistently agreed . . . that the proper forum to review the appropriateness of a state's certification is the state court"); *see also City of Tacoma*, 460 F.3d at 67. If they believe that a particular state's law imposes an unconstitutional burden on interstate commerce, they may challenge that law in federal (or state) court. *See Am. Trucking Ass'n*, 600 F.3d at 628 n.1. And if neither of these avenues proves adequate, they are free to ask Congress to amend the CWA, perhaps by reimposing the exemption for incidental vessel discharges. *See supra* note 1 (noting that, in response to the Ninth Circuit's decision vacating the exemption, Congress passed two acts that exempted small boats and recreational and commercial fishing vessels from the CWA's permitting requirements).

C

In sum, given the case law and the arguments that EPA had before it, the agency correctly concluded that it did "not have the ability to amend or reject conditions in a [state's] CWA 401 certification." EPA Response to Comments, at 14-11 to 14-12 (J.A. 1062-63) (citing *Am. Rivers, Inc. v. FERC*, 129 F.3d 99, 107, 110-11 (2d Cir. 1997)). Under those circumstances, providing notice and an opportunity for comment on the state

---

arguments not raised until the reply brief are waived, *see United States v. $6,976,934.65, Plus Interest*, 554 F.3d 123, 133 n.4 (D.C. Cir. 2009).

certifications would have served no purpose, and we decline to remand to require EPA to do a futile thing.[10]

## III

The petitioners' remaining arguments fail for the same reason that their notice-and-comment argument fails.

1. The petitioners maintain that EPA acted arbitrarily and capriciously by not properly considering comments it received regarding the draft permit. It is true that an agency acts arbitrarily and capriciously when it "fail[s] to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). And it is also true that "the opportunity to comment is meaningless

---

[10]*See Hispanic Info. & Telecomm. Network, Inc. v. FCC*, 865 F.2d 1289, 1294 (D.C. Cir. 1989) (declining to require additional administrative procedures when "it would be a pointless formality in which the result was preordained"); *Metzenbaum v. FERC*, 675 F.2d 1282, 1291 (D.C. Cir. 1982) (refusing to require notice-and-comment review of "nondiscretionary acts," as such review "was 'unnecessary,' and . . . a futile gesture"); *see also Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 659-60 (2007) (declining to remand where the alleged error "could have had no effect on the underlying agency action"); *PDK Labs. Inc. v. U.S. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (noting that, "[i]f the agency's mistake did not affect the outcome, . . . it would be senseless to vacate and remand for reconsideration"); *City of Waukesha v. EPA*, 320 F.3d 228, 246 (D.C. Cir. 2003) (noting that, "[t]he APA requires petitioners to show prejudice from an agency procedural violation," and that "[i]n making such a showing in the context of a violation of notice-and-comment requirements, petitioners may be required to demonstrate that, had proper notice been provided, they would have submitted additional, different comments that could have invalidated the rationale" for the rule).

unless the agency responds to significant points raised by the public." *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35-36 (D.C. Cir. 1977).

The comments that the petitioners allege the agency ignored concerned "the prospect that [varying state certification] requirements would be likely to present serious problems" for vessel operators moving from state to state. Pet'rs Br. 39. EPA did not, however, fail to respond to those comments. To the contrary, it told the commenters the same thing it has told this court: that under the CWA, "it is not possible to have a 'single nationwide system' that does not accommodate the states' ability to include state-specific requirements to implement their own water quality standards and requirements." EPA Response to Comments, at 14-5 (J.A. 1056); *see also id.* at 14-3 to 14-6 (J.A. 1053-57). Because on this record, EPA was correct in its assertion that it lacked authority to alter or reject certification conditions even if they presented difficulties for the operators, *see supra* Part II, further consideration or response was unnecessary. *Cf. City of Portland v. EPA*, 507 F.3d 706, 714-15 (D.C. Cir. 2007) (holding that an agency has no obligation to respond to comments that are "incapable of affecting the final rule").[11]

---

[11]The petitioners also argue that "EPA's failure to consider . . . the resulting patchwork created by the varying section 401 requirements, run[s] afoul of the uniformity principles of federal maritime law that trace their roots to Medieval times and the Laws of Oleron." Pet'rs Br. 42. But EPA responded to this argument as well, noting that "it is well established that a federal agency does not have the ability to amend or reject conditions in a [state's] CWA 401 certification," and that CWA § 401 "expressly grants States . . . the right to add conditions to federally issued NPDES permits as necessary to assure compliance with state water quality standards." EPA Response to Comments, at 14-11 to 14-12 (J.A. 1062-63). The chief case upon which the petitioners rely, *United States v. Locke*, 529

The petitioners further contend that EPA's failure to address the commenters' concerns was arbitrary in light of "the agency's own earlier, express acknowledgment that if such discharges were subject to the NPDES permit program, 'every vessel engaged in interstate commerce would be required to apply for and obtain a different, and potentially conflicting, NPDES permit for each of the various State waters through which they travel.'"  Pet'rs Br. 39 (quoting EPA Decision on Petition for Rulemaking to Repeal 40 C.F.R. 122.3(a), at 12 (Sept. 2, 2003) (J.A. 179)).  But EPA made that earlier acknowledgment in the course of explaining its 2003 decision to deny a petition to repeal the exemption for discharges incidental to the normal operation of a vessel.  EPA said it was denying the petition because it thought -- just as it thinks now -- that "[t]here is no provision under the CWA that would enable EPA to issue any type of general permit to establish consistent, nationwide standards for vessels in State waters."  EPA Decision on Petition for Rulemaking to Repeal 40 C.F.R. 122.3(a), at 12.  As we discussed in Part I, the Ninth Circuit struck that exemption down in 2008, and the petitioners do not challenge the Ninth Circuit's decision here.

2.  Finally, the petitioners assert that EPA acted arbitrarily and capriciously with respect to the analysis it conducted pursuant to the Regulatory Flexibility Act, 5 U.S.C. § 601 *et seq.*  To conform with the requirements of that Act, EPA certified that the VGP "is not likely to have a significant economic impact on a substantial number of small entities."  73 Fed. Reg at 79,481; *see* 5 U.S.C. § 605.  The petitioners contend that EPA's regulatory flexibility analysis was arbitrary and capricious in

U.S. 89 (2000), holds only that *state* laws may be preempted by comprehensive federal maritime regulation.  As EPA pointed out, the restrictions that the petitioners challenge here are the consequence of a *federal* law -- the CWA.

failing to consider the costs of complying with the state conditions that the final VGP would impose.

It is true that EPA's economic analysis did not consider the costs of complying with state conditions. *See* EPA Br. 59-60 (articulating EPA's understanding that it was not necessary to consider those costs). But the petitioners did not object to that omission below, notwithstanding that it was clear from the analysis that accompanied the draft VGP that EPA did not plan to consider such costs. Although some comments did urge that "the *Economic and Benefits Analysis* upon which EPA relies contains serious flaws," the flaws enumerated in those comments did not include the failure to consider the costs of state certification conditions. Chamber of Shipping and INTERTANKO Comments, at 36 (J.A. 687).[12] Accordingly, this objection is waived. *See, e.g.*, *Military Toxics Project v. EPA*, 146 F.3d 948, 956 (D.C. Cir. 1998).

IV

Because the petitioners have failed to establish that EPA can alter or reject state certification conditions, the additional agency procedures they demand would not have afforded them the relief they seek. The petition for review is therefore

*Denied.*

---

[12]*See id.* at 24-26 (J.A. 675-77) (articulating defects in EPA's analysis of the costs of particular EPA-imposed permit conditions, but making no mention of state certification requirements); Lake Carriers' Association Comments, at 5 (J.A. 713) (objecting to EPA's determination of the cost of compliance with the Best Management Practices provision of the draft VGP, but not suggesting that EPA must factor the costs of state certifications into the analysis).